# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| PEARL I. BOND, ) | |
|    Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:10cv00017 |
| ) | **REPORT AND** |
| ) | **RECOMMENDATION** |
| MICHAEL J. ASTRUE, ) | |
|  Commissioner of Social Security, ) | By:   PAMELA MEADE SARGENT |
|    Defendant. ) | UNITED STATES MAGISTRATE JUDGE |

*I. Background and Standard of Review*

The plaintiff, Pearl I. Bond, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2010). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify

a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Bond protectively filed her application for DIB on February 19, 2007, alleging disability as of September 2, 2006, based on pain in the back, neck, arms and hands, problems with her left eye and "severe depression." (Record, ("R."), at 91-93, 98, 110, 128.) The claim was denied initially and upon reconsideration. (R. at 45-47, 50, 51-53.) Bond then requested a hearing before an administrative law judge, ("ALJ"). (R. at 54.) The ALJ held a hearing on May 29, 2008, at which Bond was represented by counsel. (R. at 21-42.)

By decision dated November 5, 2008, the ALJ denied Bond's claim. (R. at 13-20.) The ALJ found that Bond meets the nondisability insured status requirements of the Act for DIB purposes through December 31, 2011. (R. at 15.) The ALJ also found that Bond had not engaged in substantial gainful activity since September 2, 2006. (R. at 15.) The ALJ found that the medical evidence established that Bond suffered from a severe impairment, namely degenerative disc disease of the cervical spine, but he found that Bond did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15-16.) The ALJ also found that Bond had the residual functional capacity to perform the full range of medium work.[1] (R. at 17-19.) Thus, the ALJ found that Bond was able to perform her past relevant work as a furniture sander. (R. at 19-20.) Therefore, the ALJ found that Bond was not under a disability as defined under the Act, and was

---

[1] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2010).

not eligible for benefits. (R. at 20.) *See* 20 C.F.R. § 404.1520(f) (2010).

After the ALJ issued his decision, Bond pursued her administrative appeals, (R. at 9), but the Appeals Council denied her request for review. (R. at 1-6.) Bond then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2010). This case is before the court on Bond's motion for summary judgment filed September 20, 2010, and on the Commissioner's motion for summary judgment filed October 20, 2010.

## *II. Facts*

Bond was born in 1974, (R. at 91), which classifies her as a "younger person" under 20 C.F.R. § 404.1563(c). She has a high school education and past work experience as a hand sander in a furniture factory, which the vocational expert classified as light and unskilled work.[2] (R. at 39, 111, 115.) For the reasons that follow, I recommend that this case be remanded for further consideration of Bond's mental impairments and resulting limitations on her work-related abilities. Therefore, this Report and Recommendation will focus on the medical and psychological evidence pertaining to Bond's mental impairments.

In rendering his decision, the ALJ reviewed records from Virginia Public Schools; Twin County Regional Hospital; Fries Family Care Center; Orthopedic Care Center; Troutdale Medical Center; Dr. Robert McGuffin, M.D., a state agency physician; Joseph I. Leizer, Ph.D., a state agency psychologist; Dr. Joseph Duckwall, M.D., a state agency physician; Louis Perrott, Ph.D., a state agency psychologist; Dr.

---

[2] Light work involves lifting items weighing up to 20 pounds at a time and occasionally lifting or carrying items weighing up to 10 pounds. If an individual can do light work, she also can do sedentary work. *See* 20 C.F.R. § 404.1567(b) (2010).

Paul Liebrecht, M.D.; VDH Family Planning; Mount Rogers Community Services Board; Southwest Virginia Community Health System; University of Virginia Health System Adult Psychiatric Medicine; and Infinity Counseling Center, LLC. Bond's counsel submitted additional medical records from University of Virginia Health System; Mount Rogers Community Services Board; and Troutdale Medical Center to the Appeals Council.[3]

Bond began complaining of depression as early as March 16, 2007, when she reported that she was becoming quite depressed due to an inability to work. (R. at 245, 264.) Meghan Sullivan, F.N.P., a family nurse practitioner, noted that Bond was somewhat tense and tearful at times with poor insight into her problem. (R. at 245, 264.) On April 2, 2007, Bond reported feeling "hateful and sad" over the previous year, having a very "short fuse" and being unmotivated. (R. at 244, 262-63.) She denied suicidal or homicidal ideations. (R. at 244, 262-63.) Sullivan noted that Bond was tearful. (R. at 244, 262-63.) Sullivan diagnosed dysthymia, among other things, and she prescribed fluoxetine[4] and Tramadol. (R. at 244, 262-63.)

Joseph I. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on June 5, 2007, finding that Bond had a nonsevere affective disorder. (R. at 204-16.) Leizer opined that Bond was not restricted in her activities of daily living, had no difficulties in maintaining social

---

[3] Because the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 1-6), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991.)

[4] Fluoxetine is a generic form of Prozac. *See* PHYSICIANS' DESK REFERENCE, ("PDR"), 1816 (65th ed. 2011).

functioning or in maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation of extended duration. (R. at 214.)

On August 10, 2007, Louis Perrott, Ph.D., a state agency psychologist, completed a PRTF of Bond, indicating identical findings as those made by Leizer in June 2007. (R. at 224-37.) Perrott deemed Bond's disability allegations not fully credible. (R. at 236.)

When Bond saw Sullivan on December 10, 2007, she continued to complain of depression, as well as stress and hair loss. (R. at 239-40, 258-60.) Sullivan noted that Bond was on a waiting list to be seen at Mount Rogers Community Services Board. (R. at 239, 258.) Sullivan diagnosed dysthymia, and she referred Bond to the University of Virginia, ("U.Va."), for psychiatric telemedicine. (R. at 240, 259.)

Bond saw Pat Frost, a licensed clinical social worker with Mount Rogers Community Services Board, ("Mount Rogers"), on March 12, 2008, for intake. (R. at 265-72.) She stated that she began having symptoms of depression two years previously and had contemplated suicide a year previously. (R. at 265.) Bond reported that her symptoms worsened when she began having pain in her neck and hand, eventually resulting in an inability to work. (R. at 265.) Bond reported no previous mental health treatment. (R. at 265.) She reported the following symptoms: psychomotor restlessness; loss of interest; blunted, sad/dysthymic, irritable and apathetic mood/affect; decreased frustration tolerance; difficulty sleeping/insomnia; withdrawal; decreased appetite/weight loss; impaired concentration/ability to focus; possible low average intellectual functioning; poor peer relations; infrequent suicidal ideations without a plan; depression; guilt or self-blame; self-directed anger; hopelessness; and a minimal support system. (R. at 266-67.)

Frost diagnosed major depressive disorder, single episode, moderate, and she noted the need to rule out an anxiety disorder. (R. at 271.) Frost placed Bond's then-current Global Assessment of Functioning, ("GAF"),[5] score at 55,[6] with the highest in the previous year also being 55. (R. at 271.) Frost recommended counseling sessions, the first of which Bond underwent that day. (R. at 271.)

On April 3, 2008, Bond was oriented and in no acute distress. (R. at 256.) Sullivan diagnosed depression with anxiety and prescribed fluoxetine and trazodone. (R. at 256.) That same day, she participated in a telepsychiatry intake with Dr. Timothy Jana, M.D., with the University of Virginia Adult Psychiatric Medicine program. (R. at 279-81.) Bond reported anger, mood swings, worry, symptoms of panic, some repetitive behaviors, fatigue and decreased appetite. (R. at 279.) She reported that being in a crowd of people made her feel as if she were suffocating. (R. at 279.) Bond reported being on a low dosage of Prozac a year previously, but had to discontinue it due to financial reasons. (R. at 279.) She stated that she was not sure if the medication helped. (R. at 279.) Bond had decreased motor activity overall, but was in no apparent distress. (R. at 279.) Her mood was depressed, and her affect was dysthymic overall. (R. at 279.) She denied auditory or visual hallucinations, and she had no gross delusions. (R. at 280.) Her thought process was linear, logical and goal-directed, and she was neither suicidal nor homicidal. (R. at 280.) Dr. Jana diagnosed major depression, single episode, moderate; panic disorder with agoraphobia; generalized anxiety disorder; and consider obsessive compulsive disorder, ("OCD").

---

[5] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994.)

[6] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning...." DSM-IV at 32.

(R. at 280.) Dr. Jana placed Bond's then-current GAF score at 45-50,[7] and he prescribed Prozac. (R. at 280.)

On April 17, 2008, Frost noted psychomotor restlessness, loss of interest, crying episodes, low energy, impaired concentration, sleep and appetite disturbance, withdrawal and suicidal ideation with no plan. (R. at 275.) Her affect/mood were blunted, sad, irritable and anxious. (R. at 275.) Bond stated that, despite beginning fluoxetine and trazodone approximately two weeks previously, she could tell no difference in her condition. (R. at 275.) Bond appeared more agitated and admitted to continued intermittent suicidal ideation with no intent. (R. at 275.)

On May 6, 2008, Bond reported feeling "the same." (R. at 277.) She reported experiencing panic attacks daily with no known trigger, lasting about an hour. (R. at 277.) She further reported that trazodone was not helping her sleep. (R. at 277.) Sullivan noted that Bond was in no acute distress and was alert and oriented. (R. at 277.) She again diagnosed depression with anxiety and continued Bond on medication. (R. at 277-78.)

Bond saw Dr. Larry Merkel, M.D., Ph.D., via telepsychiatry for medication management on July 3, 2008. (R. at 291-93.) Bond reported continued depression with mood swings, despite having taken Prozac for two to three months. (R. at 291.) She further reported continued intermittent suicidal ideation, worse at times, but with no intent. (R. at 291.) Bond reported approximately two panic attacks weekly, lasting for hours. (R. at 291.) She reported continued symptoms of OCD, including frequent hand washing. (R. at 291.) Bond stated that she was more irritable, feeling easily

---

[7] A GAF score of 41 to 50 indicates "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning. . . ." DSM-IV at 32.

aggravated and impatient. (R. at 291.) Dr. Merkel described Bond as alert and oriented with a dysphoric affect with a restricted range, without evidence of a thought disorder or psychosis. (R. at 291.) Dr. Merkel diagnosed major depression, single episode, moderate; panic disorder with agoraphobia; generalized anxiety disorder; and possible OCD. (R. at 291.) He planned to gradually increase her dosage of Prozac. (R. at 292.) That same day, Bond saw Dr. William Powers, M.D., at Troutdale Medical Center. (R. at 300-01.) She was again diagnosed with depression with anxiety, and Dr. Powers increased her dosage of fluoxetine as directed by Dr. Merkel. (R. at 300.)

On July 16, 2008, Bond saw Angelia Berry, Psy.D., a resident in psychology, and Christopher Carusi, Ph.D., a licensed clinical psychologist, for a psychological evaluation at the request of Disability Determination Services. (R. at 283-87.) Bond was oriented with mildly impaired short-term memory and moderately impaired working memory. (R. at 285.) Her judgment and insight were deemed moderately impaired. (R. at 285.) Bond's affect appeared anxious and irritable. (R. at 285.) On the Wechsler Adult Intelligence Scale-Third Edition, ("WAIS-III"), Bond achieved a verbal IQ score of 61, a performance IQ score of 60 and a full-scale IQ score of 58, all falling within the extremely low range of intellectual functioning. (R. at 285.) These results were believed to be an underestimate of Bond's then-current level of functioning as they were inconsistent with her school records indicating average to above average performance over a two-year period. (R. at 286.) Likewise, the results of the Minnesota Multiphasic Personality Inventory-2, ("MMPI-2"), were deemed invalid due to "extreme over reporting of symptoms." (R. at 286.) Bond's effort on the interview and mental status examination was variable, frequently appearing to give up easily or not give her best effort. (R. at 286.) Berry and Carusi noted that the possibility of malingering should be considered. (R. at 286.) They placed Bond's

then-current GAF score at 70.[8] (R. at 287.) However, they opined that Bond was unable to manage her finances based on impaired performance with mathematical calculations and impaired judgment and memory. (R. at 287.)

Berry completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental) on August 14, 2008, simply noting that Bond's abilities were "difficult to assess due to invalid testing and questionable self-report." (R. at 288-90.) This finding was affirmed by Carusi on August 18, 2008. (R. at 290.)

On November 11, 2008, Bond saw Gwen Woodmansee, M.S.W. at Mount Rogers, for counseling. (R. at 295.) Bond was quite anxious and fidgeted in her seat. (R. at 295.) She noted difficulty changing counselors, stating that it was hard for her to trust new people and open up to them. (R. at 295.) Bond reported continued depression and chronic pain. (R. at 295.) She reported no active suicidal intent or plan. (R. at 295.) Woodmansee reported no change in Bond's progress. (R. at 295.) Bond again saw Woodmansee on December 31, 2008, at which time her affect/mood were deemed constricted, irritable and anxious. (R. at 311.) She reported continued depression, but denied active suicidal thoughts, despite feeling fairly hopeless. (R. at 311.) Woodmansee worked with Bond on current negative thinking, some of which remained irrational and clearly indicative of a significant level of depression. (R. at 311.) Bond also reported continued anxiety and difficulty being around most people outside of her family. (R. at 311.) Woodmansee noted that Bond had made only minimal progress. (R. at 311.)

---

[8] A GAF score of 61 to 70 indicates "[s]ome mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

Bond returned to see Sullivan on January 5, 2009, with complaints of nerves and depression, noting that she had been out of medication since September. (R. at 298-99.) She wished to start an antidepressant other than Prozac, which she did not feel helped her symptoms. (R. at 298.) Sullivan noted that Bond was oriented and in no acute distress. (R. at 298.) She diagnosed depression with anxiety, and she prescribed Cymbalta. (R. at 299.) On January 23, 2009, Bond's mood/affect were irritable and anxious, and Woodmansee noted that she had poor insight and impaired concentration. (R. at 310.) Bond reported ongoing depressed mood, excessive irritability and poor motivation and energy. (R. at 310.) She seemed anxious and had some difficulty staying focused at times. (R. at 310.) Bond denied any thoughts of harming herself or others and had no symptoms of psychosis. (R. at 310.) Woodmansee reported that Bond had a very negative outlook on her life and the world in general, indicative of ongoing depression. (R. at 310.) She again noted only minimal progress. (R. at 310.)

On February 11, 2009, Bond informed Sullivan that Cymbalta made her sick. (R. at 304.) She stated that her depression, anger, moodiness and irritability were worse. (R. at 304.) Bond appeared to be in no acute distress and was oriented. (R. at 304.) She was diagnosed with depression with anxiety, and Sullivan prescribed Zoloft. (R. at 304.) On February 16, 2009, Bond's allegations and Woodmansee's evaluation remained essentially unchanged. (R. at 309.) On March 16, 2009, Bond reported frustration due to new medications not helping her mental conditions. (R. at 308.) She admitted to passive suicidal thoughts of "not wanting to be around," but denied plan or intent. (R. at 308.) Woodmansee again noted only minimal progress. (R. at 308.) The same day, Woodmansee completed a Clinical Assessment Update. (R. at 312-16.) She diagnosed major depression, single episode, and the need to rule out an anxiety disorder, not otherwise specified. (R. at 314.) Woodmansee assessed Bond's then-

current GAF score as 55. (R. at 314.) She concluded that Bond needed ongoing counseling and education. (R. at 315.) Bond missed her appointments on April 13 and April 27, 2009. (R. at 306-07.)

On April 6, 2009, Bond reported feeling worse on Zoloft and that trazodone was not helping much with insomnia. (R. at 320.) She reported a "spell" on her way there in which her mouth felt numb, and she felt nauseated. (R. at 320.) Bond was oriented and in no acute distress. (R. at 320.) Sullivan increased Bond's dosages of both medications. (R. at 320.) Bond returned to Woodmansee on May 12, 2009. (R. at 327.) Her mood/affect were sad, irritable and anxious. (R. at 327.) She reported increased irritability and reported having experienced a panic attack on Mother's Day while visiting with her mother. (R. at 327.) Bond reported not wanting to go out of the house unless absolutely necessary. (R. at 327.) She denied active suicidal thoughts, but admitted to thoughts of not wanting to be around. (R. at 327.) Bond reported that Zoloft and trazodone were not helping, noting increased irritability. (R. at 327.) Again, minimal progress was noted. (R. at 327.)

On May 18, 2009, Bond continued to report no relief with Zoloft, stating that Prozac had helped some. (R. at 318.) She reported panic attacks and bad mood swings. (R. at 318.) Bond was oriented and in no acute distress. (R. at 318.) Sullivan diagnosed depression with anxiety (versus bipolar), and she decreased Bond's Zoloft dosage and began fluoxetine. (R. at 318.) On July 6, 2009, Bond reported continuing depression and intermittent suicidal ideation without plan or intent. (R. at 326.) Woodmansee noted that Bond's affect/mood were sad and irritable, and she had impaired concentration. (R. at 326.) She reported taking her medications as prescribed, but was not yet seeing benefit from Prozac. (R. at 326.) Bond reported stress regarding some behavioral issues with her youngest son and financial

limitations. (R. at 326.) Woodmansee reported no change in Bond's progress. (R. at 326.) On August 5, 2009, Bond's condition was essentially unchanged. (R. at 325.) She denied any then-current suicidal or homicidal ideations, and Woodmansee reported minimal progress. (R. at 325.)

Bond saw Jane Sage, a family nurse practitioner at Troutdale Medical Center, on August 12, 2009, for medication refills. (R. at 331-32.) She reported that she felt like the Prozac was helping "a little bit," and asked to increase the dosage. (R. at 331.) However, she reported continued irritability, but denied suicidal or homicidal ideations. (R. at 331.) Bond was oriented and in no acute distress. (R. at 331.) She had a mildly flat affect, but did not appear to be depressed, anxious or stressed. (R. at 331.) Sage diagnosed depression with anxiety, and she increased her fluoxetine and trazodone. (R. at 331.) Bond saw Marcy S. Rosenbaum, a licensed clinical social worker, the same day. (R. at 322-23.) Her mood was described as angry, irritable and depressed. (R. at 322.) She reported panic attacks every other day and poor sleep, despite taking trazodone. (R. at 322.) She further reported moderately impaired concentration and feeling overwhelmed most of the time. (R. at 322.) Bond reported sadness and crying easily intermittently and thoughts of hurting herself at times. (R. at 322.) She reported some anxiety. (R. at 322.) Bond's comprehension was deemed impaired, but her thoughts were logical, and her insight and judgment were fair. (R. at 323.) Rosenbaum diagnosed a mood disorder, not otherwise specified, and mild mental retardation per Bond's report of an IQ of 60. (R. at 323.) Bond's then-current GAF score was assessed at 50. (R. at 323.) She was instructed to continue counseling. (R. at 323.) Bond did not keep her appointment with Woodmansee on September 2, 2009. (R. at 324.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2010); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2010).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2003 & Supp. 2010); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial

evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Bond argues that the ALJ erred by finding that she does not suffer from a severe mental impairment, by failing to evaluate all of the relevant evidence and by substituting his own opinion for that of highly qualified mental health professionals. (Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 8-13.) Bond also argues that her claims should be remanded to the Commissioner based on new and material evidence. (Plaintiff's Brief at 13.)

Before discussing Bond's mental impairment, I note that her argument for remand based on new and material evidence is inappropriate, as the evidence referenced was presented to, and considered by, the Appeals Council. The evidence is not "new" as contemplated by 42 U.S.C. § 405(g). Section 405(g) states that "[t]he court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C.A. § 405(g) (West 2003 & Supp. 2010). Because the evidence cited by Bond was considered by the Appeals Council, the court must determine whether substantial evidence supports the Commissioner's decision considering the record in its entirety, including the evidence presented to the Appeals Council. *See* Wilkins, 953 F.2d at 96. Thus, I will consider this evidence in determining whether substantial evidence supports the Commissioner's finding that Bond does not suffer from a severe mental impairment. For the following reasons, I find that it does not.

The Social Security Regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. § 404.1521(a) (2010). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. § 404.1521(b) (2010). The Fourth Circuit held in *Evans v. Heckler*, that "[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler*, 724 F.2d 914, 920) (11th Cir. 1984)) (emphasis in original).

Treating mental health professionals have placed Bond's GAF score at 55 in March 2008, 45 to 50 in April 2008, 55 in March 2009 and 50 in August 2009, indicating moderate to serious symptoms. (R. at 271, 280, 314, 323.) Bond was taking various medications at varying dosages during these times, which she consistently reported either did not help or made her symptoms worse. (R. at 275, 277, 291, 298, 304, 308, 318, 320, 326-27.) Bond also has complained of panic attacks, difficulty leaving her house, difficulty being around people and suicidal ideation. (R. at 265, 275, 277, 279, 291, 308, 311, 318, 322, 326-27.) In March 2007, she was deemed to have poor insight into her problems. (R. at 245, 264.) In August 2009, her comprehension was deemed impaired. (R. at 323.) During the course of Bond's mental health counseling, it was noted that she made either no progress or minimal progress and, in March 2009, after participating in counseling for one year, continued counseling and education was recommended. (R. at 315.) Her counselor noted some

irrational, negative thinking, indicative of a significant level of depression in December 2008. (R. at 311.) In January 2009, her insight was deemed poor. (R. at 310.) Bond's mental health counselors consistently found her concentration to be impaired. (R. at 275, 295, 308-11, 325-27.) None of Bond's treating mental health sources noted any indication of malingering or overreporting of symptoms by Bond. Nonetheless, the ALJ appears to have accepted the findings of Berry and Carusi, one-time psychological examiners, who concluded that Bond was overreporting her symptoms and might be malingering. (R. at 286.) However, I note that this opinion of Berry and Carusi is inconsistent with the other substantial evidence of record, as set forth above. It is important to note that Berry and Carusi did not find that Bond did not suffer from a mental impairment. In fact, Berry and Carusi stated that Bond's working memory screening revealed moderate impairment. (R. at 285.) Additionally, although the state agency psychologists found that Bond did not suffer from a severe mental impairment, they did not have the benefit of reviewing the great majority of the treatment records relevant to Bond's mental impairments, including counseling notes, notes from Dr. Merkel and Dr. Jana and most of the notes from Troutdale Medical Center.

It is well-settled that the ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain*, 715 F.2d at 869. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 404.1527(d)(2) (2010). However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). In fact, "if a physician's opinion

is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. Here, I do not find that the treating sources' opinions are inconsistent with other substantial evidence of record because Berry and Carusi essentially offered no opinion as to the severity of Bond's mental impairments. Instead, they declined to give an opinion based on their suspicion of malingering and overreporting of symptoms. Additionally, as stated above, the state agency psychologists opined that Bond did not have a severe mental impairment, but they did not have the benefit of reviewing the majority of treatment notes relevant to Bond's mental impairments.

Moreover, the ALJ failed to explicitly indicate that all relevant evidence had been weighed and its weight. *See Stawls v. Califano,* 596 F.2d 1209, 1213 (4th Cir. 1979). Specifically, the ALJ failed to explain what weight, if any, he gave to the findings and opinions of Bond's treating mental health sources. "Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Arnold v. Sec'y*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

It is for all of the above-stated reasons, that I find that the ALJ's finding that Bond does not suffer from a severe mental impairment is not supported by substantial evidence, and I recommend that the court remand the case to the Commissioner for further consideration consistent with this Report and Recommendation.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence does not exist to support the ALJ's finding that Bond does not suffer from a severe mental impairment; and

2. Substantial evidence does not exist to support the ALJ's finding that Bond is not disabled under the Act.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Bond's and the Commissioner's motions for summary judgment, vacate the final decision of the Commissioner denying benefits and remand the case to the Commissioner for further consideration consistent with this Report and Recommendation. I further recommend that the court deny Bond's request to present oral argument based on my finding that it is not necessary, in that the parties have more than adequately addressed the relevant issues in their written arguments.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2010):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to

which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED: February 7, 2011.

/s/ *Pamela Meade Sargent*
UNITED STATES
MAGISTRATE JUDGE